[Cite as *State v. Fairchild*, 2013-Ohio-2382.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY


STATE OF OHIO,

      PLAINTIFF-APPELLEE,                   CASE NO. 6-12-18

      v.

LORI ANN FAIRCHILD,                  O P I N I O N

      DEFENDANT-APPELLANT.


Appeal from Hardin County Common Pleas Court
Trial Court No. 20112205CRI

Judgment Affirmed

Date of Decision:   June 10, 2013


APPEARANCES:

    *Michael J. Short*  for Appellant

    *Bradford W. Bailey and Destiny R. Hudson*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Lori Ann Fairchild ("Fairchild") appeals the October 10, 2012, judgment of the Hardin County Common Pleas Court sentencing Fairchild to community control sanctions following Fairchild's bench trial conviction for Grand Theft, in violation of R.C. 2913.02(A)(3),(B)(2), a felony of the fourth degree.[1]

{¶2} On October 3, 2011, Fairchild was indicted for three counts of Grand Theft, in violation of R.C. 2913.02(A)(1),(B)(2), R.C. 2913.02(A)(2),(B)(2), and R.C. 2913.02(A)(3),(B)(2), all felonies of the fourth degree. (Doc. 1). The indictment alleged that on or about October 21, 2009, through on or about May 1, 2011, Fairchild knowingly obtained property or services without consent, and that the value of the property or services stolen was more than five thousand dollars and less than one hundred thousand dollars. (Doc. 1). The property or services alleged to have been stolen were benefits from the Hardin County Department of Jobs and Family Services ("HCDJFS"), specifically, food stamps. (Doc. 20).

{¶3} On October 17, 2011, Fairchild pled not guilty to the charges. (Doc. 11).

{¶4} On May 30, 2012, Fairchild filed a waiver of jury trial. (Doc. 26).

---

[1] Fairchild was actually convicted of three counts of Grand Theft, but they were found to be allied offenses of similar import, and the State elected to sentence on the (A)(3) charge.

{¶5} A bench trial was held on May 30, 2012. At trial, the State called Jessica Ziegler, formerly of HCDJFS, Jason Snyder, a Fraud Investigator for HCDJFS, and Joe Carl, formerly of the Ada Police Department, and then the State rested. The State produced evidence that Kenneth Fairchild ("Kenneth") was living in Fairchild's home, that Fairchild was obligated to report Kenneth's presence to HCDJFS, that Fairchild did not notify HCDJFS of Kenneth residing in the home, and that Fairchild continued to receive food stamps despite not being eligible when factoring in Kenneth's income.

{¶6} At the conclusion of the State's case, Fairchild made a Criminal Rule 29 motion for acquittal, which was denied, and then Fairchild presented her case-in-chief, calling Kenneth, her fiancé, and taking the stand herself. When Fairchild concluded her case-in-chief, the State recalled Jason Snyder in rebuttal. Following Snyder's testimony, the parties agreed to submit their closing arguments via trial briefs.

{¶7} The State filed its closing argument/trial brief on June 8, 2012. (Doc. 27). Fairchild filed her closing trial brief on June 11, 2012. (Doc. 28).

{¶8} On July 13, 2012, the court convened to announce the decision, and found Fairchild guilty of all three counts of Grand Theft. (Doc. 30). The court then ordered a pre-sentence investigation and set the matter for sentencing. (*Id.*)

{¶9} On October 9, 2012, a sentencing hearing was held. (Doc. 38). The court found that Fairchild's convictions were allied offenses of similar import and directed the State to elect the charge to which it wished to proceed for the purposes of sentencing. The State elected to proceed with sentencing on Count 3, Grand Theft, in violation of R.C. 2913.02(A)(3),(B)(2), a felony of the fourth degree. Ultimately the trial court sentenced Fairchild to three years of community control sanctions. (*Id*.) Among the provisions of Fairchild's community control sanctions, Fairchild was ordered to perform 80 hours of community service, and to pay restitution of $9,456.00 to the Hardin County Department of Job and Family Services. (*Id*.) Fairchild was also notified that in the event she violated her community control sanctions, she would be sent to prison for 17 months. (*Id*.)

{¶10} It is from this judgment that Fairchild appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED IN FINDING THE DEFENDANT GUILTY, AS THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION.**

{¶11} As the nature of the discussion will relate to both assignments of error, we elect to address the assignments of error together.

*First and Second Assignments of Error*

**{¶12}** In her first and second assignments of error, Fairchild argues that there was insufficient evidence to convict her, and that her convictions were against the manifest weight of the evidence. Specifically, Fairchild contends the State failed to establish that Fairchild possessed the requisite *mens rea* of "knowingly," and that the State failed to establish that Kenneth Fairchild was a member of Fairchild's household.

**{¶13}** Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *State v. Smith*, 80 Ohio St.3d 89, 113 (1997).

**{¶14}** The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶15} Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *Volkman, supra,* at ¶ 12; *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Andrews,* 3d Dist. No. 1–05–70, 2006-Ohio-3764, ¶ 30, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *Thompkins*, 78 Ohio St.3d at 387.

{¶16} Fairchild was charged with violating R.C. 2913.02(A)(1),(B)(2), R.C. 2913.02(A)(2),(B)(2), and R.C. 2913.02(A)(3),(B)(2), which read at the time the Grand Jury returned its indictment,

> **(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**
>
> **(1) Without the consent of the owner or person authorized to give consent;**

**(2)   Beyond the scope of the express or implied consent of the owner or person authorized to give consent;**

**(3)   By deception;**

**\* \* \***

**(B)(1) Whoever violates this section is guilty of theft.**

**(2) \* \* \* If the value of the property or services stolen is five thousand dollars or more and is less than one hundred thousand dollars, a violation of this section is grand theft, a felony of the fourth degree. \* \* \***[2]

{¶17} The requisite mental state for committing a violation of R.C. 2913.02(A), "knowingly," is defined in R.C. 2901.22(B).   "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."  R.C. 2901.22(B).

{¶18} To prove that Fairchild committed Grand Theft as alleged in the indictment, the State first called Jessica Ziegler ("Ziegler"), formerly of HCDJFS. Ziegler testified that she worked for HCDJFS from July of 2002 until June of 2010 as an income maintenance case worker/eligibility referral specialist.  (Tr. at 5). Ziegler testified that as part of her duties, she would take the paper application filled out by a person applying for federal and state programs, including, *inter alia*,

---

[2] The statute has since been amended.  The (B)(2) portion cited now reads, "[i]f the value of the property or services stolen is seven thousand five hundred dollars or more and is less than one hundred thousand dollars, a violation of this section is grand theft, a felony of the fourth degree."

food stamps, and go through the application step by step with the person applying to verify the person's information. (Tr. at 5, 7).

{¶19} Ziegler testified that she met with Fairchild on April 20, 2009, regarding her application. (Tr. at 6). According to Ziegler, at that meeting with Fairchild, and in the accompanying paperwork, Fairchild indicated that the members of her household were Fairchild herself, and her two sons Atom and Jake. (Tr. at 10). Ziegler testified that she informed Fairchild of the need to report any changes to the information reported, including additional people in the home, adding that if Fairchild was ever in any doubt about whether she should report something, it was better to report a change. (Tr. at 12-13). Ziegler testified that Fairchild stated that she understood and that Fairchild signed that she understood her rights and responsibilities. (Tr. at 17). Copies of signed documents indicating Fairchild's duties and understanding were introduced into evidence. (State's Exs. 1, 2).

{¶20} The State next called Jason Snyder ("Snyder"), a Fraud Investigator for HCDJFS. (Tr. at 23). Snyder testified that his department received a complaint regarding Fairchild, which alleged that Fairchild had an unreported person living in her home, namely Kenneth. (Tr. at 27). Snyder testified that after receiving the complaint and reviewing Fairchild's file to see if there were any adult males listed as residing in the home (which there were not), Snyder began an

investigation of Fairchild by speaking to people that Fairchild knew, including Fairchild's neighbors. (Tr. at 34-35). Snyder testified that "several witnesses state[d] that [Kenneth] was there daily." (Tr. at 70).

**{¶21}** Snyder testified that he conducted surveillance on Fairchild's home, observing that Kenneth's blue Audi was at Fairchild's residence approximately 12 of the 18 times Snyder conducted surveillance. (Tr. at 36). Snyder testified that during one of the instances in which he was conducting surveillance, he followed Kenneth when Kenneth left Fairchild's residence, and observed Kenneth driving to pick up his 18 wheeler, which he used for his job as a truck driver. (Tr. at 37).

**{¶22}** Snyder testified that he spoke with Fairchild and Kenneth, and Fairchild indicated that Kenneth stayed at her home periodically. (Tr. at 39). Snyder testified that Fairchild told him during an interview that Kenneth gave Fairchild money and was her "sugar daddy." (Tr. at 42). According to Snyder, Fairchild testified that Kenneth was often on the road, as he was a truck driver. (Tr. at 43). Snyder testified that Fairchild and Kenneth both told Snyder that Kenneth's primary residence was in Michigan, with Kenneth's mother. (Tr. at 43). However, Snyder testified that Fairchild eventually "agreed that [Kenneth] was there the majority of the time"—with "there" being Fairchild's Ada residence. (Tr. at 44). In addition, Snyder testified that he conducted further investigation of

Kenneth's alleged Michigan residence with his mother, and through that investigation determined that Kenneth was not living in Michigan. (Tr. at 54).

{¶23} Snyder testified that he conducted an investigatory tour of Fairchild's residence, and found that half of Fairchild's bedroom was decorated with Kenneth's things. (Tr. at 49). Snyder also inquired as to whether Kenneth ate food at Fairchild's house, to which Fairchild said that she did not want to lose her food stamps, so she was going to have to tell Snyder no. (Tr. at 45). Snyder testified that Fairchild informed him that Kenneth was paying Fairchild's bills, and that Kenneth occasionally ate Fairchild's food, and that Kenneth occasionally bought Fairchild and her children Subway and pizza. (Tr. at 42).

{¶24} Snyder also testified that on December 3, 2010, Fairchild filed for a Civil Protection Order, and on that CPO, Fairchild listed Kenneth as a household member. (Tr. at 40). Ultimately, Snyder concluded through his investigation that "[b]ased on all of the evidence available that I had during the time I submitted the case, I believe [Fairchild] failed to report Kenneth * * * in the home, and that at that time created an overpayment." (Tr. at 52).

{¶25} Snyder testified that Kenneth being in Fairchild's home affected Fairchild's eligibility for benefits. (*Id.*) Snyder testified that "[b]ased on [Kenneth's] income, believing that he was residing there a majority of the time,

[Fairchild] would not receive any food stamps based—he went above the income rate." (Tr. at 54).

**{¶26}** Snyder then testified that the dates used in the indictment, October 21, 2009, through May 1, 2011, were calculated based on when Kenneth's income could be verified by investigation. (Tr. at 57). Snyder testified that there was evidence that Kenneth was in Fairchild's home prior to the October 21, 2009 date used, which would have resulted in an even greater overpayment to Fairchild, but the October 21, 2009, date was used because it was as far back as Snyder could trace Kenneth's income and thus verify where overpayments had been issued. (Tr. at 57). Snyder testified that State's Exhibit 4 was a document illustrating the amount of income reported by Fairchild for the indicted time period, and the amount of income that should have been reported with Kenneth in the home. (State's Ex. 4). According to the calculation, Fairchild would not have been eligible for food stamps and she had received an overpayment of $9,456.00. (*Id*).

**{¶27}** On cross examination, Snyder testified that it took him a year to get around to conducting the investigation of Fairchild because he was the only fraud investigator in the county. (Tr. at 64). Snyder also testified that whether a person is in the home is based on the "totality of it," referring to all of the evidence. (Tr. at 63).

{¶28} The State next called Joe Carl, a former Ada Police Officer. Carl testified that he received a police report on December 5, 2010, about Kenneth's vehicle being vandalized at Fairchild's home. (Tr. at 74). Carl testified that at the time, Kenneth gave his mother's Michigan address as his home address. (Tr. at 75). Carl testified that he had dealt with Kenneth before in Ada, when Kenneth filed a report about missing football tickets that Kenneth had delivered to Fairchild's residence. (Tr. at 75-76).

{¶29} After Carl testified, the State rested. Following Fairchild's Criminal Rule 29 motion for acquittal, and the denial of that motion, Fairchild presented her case-in-chief, first calling Kenneth to the stand.

{¶30} Kenneth testified that his residence was in Freeland, Michigan with his mother. (Tr. at 82). He testified that after work he would regularly stop at Fairchild's home to check on her. (Tr. at 85). Kenneth testified that he stayed with his friend Todd or at with friend Mark four or five nights a week. (Tr. at 86). According to Kenneth, he only stayed at Fairchild's residence two nights per week at most because the children were rude and disrespectful. (Tr. at 87).

{¶31} Kenneth testified that he received mail in Michigan and that he paid Michigan taxes. (Tr. at 87-88). Kenneth also testified that his car was at Fairchild's residence so often because Fairchild needed to use it. (Tr. at 90). Kenneth did admit in his testimony that he had been paying Fairchild's bills, and

that he had sent a letter that stated he slept at Fairchild's residence between routes as a driver. (Tr. at 93-94).

{¶32} Fairchild then took the stand, and testified that Kenneth stayed with her only one or two nights a week. (Tr. at 97). Fairchild testified that she reported Kenneth was staying in her home to "everyone." (Tr. at 100). Fairchild testified that Kenneth was not a household member despite what she wrote on the CPO, and that Kenneth did not reside with her. (Tr. at 113).

{¶33} At the conclusion of Fairchild's testimony, Fairchild rested. The State then recalled Snyder in rebuttal. On rebuttal, Snyder testified that he never witnessed Fairchild drive Kenneth's car. (Tr. at 116). Snyder also testified that when he asked where Kenneth stayed, the names Todd and Mike never came up. (Tr. at 118).

{¶34} On appeal, Fairchild argues that there was insufficient evidence to convict her, specifically contending that the State did not present evidence that Fairchild committed Grand Theft "knowingly." However, the State presented evidence that when Fairchild applied for food stamps, she stated that the only people residing in her household were herself, and her two children. The State presented evidence that Fairchild was informed that she needed to disclose anyone else living in the residence at that time, and needed to disclose anyone that resided in the residence in the future. In addition, Ziegler testified that she informed

-13-

Fairchild that if Fairchild was in any doubt about whether she should report something, that Fairchild should report it.

{¶35} Moreover, not only did the State present evidence that Fairchild was verbally informed, but Fairchild also signed documents stating that no one other than herself and her two children were residing in her home and that she understood her duty to disclose any changes. These documents were introduced into the record. Based upon this evidence, we find that there was sufficient evidence for the trial court to determine, beyond a reasonable doubt, that Fairchild acted "knowingly."

{¶36} Fairchild also argues that there was insufficient evidence to establish that the alleged thefts began on or about October 21, 2009. However, testimony and evidence established that the October 21, 2009 date was chosen because it was the earliest point at which Kenneth's income could be verified, and although it appeared that Kenneth had been a household member before that, it could not be verified that financially it created an issue until then. Snyder testified that Fairchild was receiving an overpayment beginning from that October 21, 2009, date, continuing through May 1, 2011, and the State entered a document calculating this overpayment and the dates into evidence. Therefore we find that sufficient evidence was introduced that the court could find beyond a reasonable

doubt that the overpayments began October 21, 2009, and continued until May 1, 2011.

{¶37} Accordingly, we find that there was sufficient evidence presented for the trial court to find Fairchild guilty of the crimes as charged. Therefore, Fairchild's second assignment of error is overruled.

{¶38} In arguing that her conviction was against the manifest weight of the evidence, Fairchild argues essentially that trial court improperly came to the conclusion that Kenneth was a member of Fairchild's household, and again, that Fairchild did not act knowingly.

{¶39} While Kenneth and Fairchild both testified that Kenneth only stayed at Fairchild's home at most two nights a week, the court, acting as trier-of-fact, was free to find those statements disingenuous. In addition, while Kenneth stated that he resided in Michigan with his mother, Snyder testified that claim was investigated and found to be untrue. Moreover, Snyder testified that the other people Kenneth claimed to regularly be staying with in Ohio were never mentioned during Snyder's investigation.

{¶40} The testimony showed that Kenneth ate meals at, and regularly stayed at, Fairchild's home. Testimony established that Kenneth paid Fairchild's bills, ate her food, and had part of her bedroom decorated to his liking. Testimony was presented that Kenneth was at Fairchild's residence almost every day, and that

Fairchild stated Kenneth was there the "majority of the time." (Tr. at 44). Furthermore, evidence established that Fairchild filed a CPO and listed Kenneth as a member of her household. Under these circumstances, we cannot find that Fairchild's convictions were against the manifest weight of the evidence or that the fact-finder clearly lost its way. Accordingly, Fairchild's first assignment of error is overruled.

{¶41} For the foregoing reasons, Fairchild's assignments of error are overruled and the judgment of the Hardin County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**